FILED

05/10/2017

Clerk of the
Appellate Courts



IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 7, 2017 Session

**JEFFREY WALTON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County
No. 11-02773     Lee V. Coffee, Judge**

_____

**No. W2016-01395-CCA-R3-PC**

_____

Jeffrey Walton ("the Petitioner") was convicted of vandalism over the value of $10,000 and burglary of a building and received an effective sentence of twenty-seven years. He filed a petition for post-conviction relief, which the post-conviction court denied. On appeal, the Petitioner argues that second and third trial counsel's performance was deficient because they (1) failed to prepare a trial strategy; (2) failed to investigate the background of Barrow-Agee Laboratories and discover a fatal variance in the indictment; (3) failed to properly cross-examine witnesses; and (4) failed to request jury instructions on the defenses of duress and necessity. The Petitioner asserts that he was prejudiced because absent these deficiencies, he would have likely been convicted of a lesser-included offense or acquitted of the offenses. After a thorough review of the record and applicable case law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Josie S. Holland, Memphis, Tennessee, for the appellant, Jeffrey Walton.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

*Jury Trial*

In our opinion on the Petitioner's direct appeal of his convictions, this court summarized the testimony at trial as the following:

> This case involves the [Petitioner]'s unlawful entry into and vandalism of Barrow-Agee Laboratories ("Barrow-Agee"), a food and drug testing laboratory in Memphis, the evening of January 13, 2011.

> Brenda Banks, a chemist and twenty-two-year employee of Barrow-Agee, testified that she closed the building at 6:15 p.m. on January 13, 2011. She said that no one was in the building when she left that evening and that she secured the premises by setting an alarm. When she left, the building was in good condition and none of the damage shown in the photograph exhibits was present.

> Thomas Bradberry, a security guard for Barrow-Agee, testified that he received a call around 11:20 p.m. on January 13 that the alarm at the laboratory had been triggered. When he arrived and assessed the scene, he heard some noise coming from the back of the building that sounded like someone running. He observed a hole in the wall where the venting system was located. Bradberry explained that the venting system had been "busted" out and a light was shining outward through the hole. He saw a pair of legs emerge from the hole, and he ordered the person to raise his hands. However, the person went back inside the building. Bradberry was unable to see the person's face, but he saw that the person was wearing an army fatigue jacket and tennis shoes.

> Bradberry testified that the building had plate glass windows, making it possible for him to see inside while the officers were searching for the intruder. Through the windows, he saw the intruder's feet partially fall through the ceiling of three separate offices or rooms in the building. He saw the police bring the intruder out of the building in handcuffs and noted that the intruder was wearing the same clothing as the person he had seen earlier trying to exit the hole at the back of the building. He heard the intruder tell the officers that he was homeless and had entered the building looking for something to eat. Bradberry entered the building after the

intruder was arrested, and he observed that the ceiling tiles were "tore up" and the doors to several refrigerators and incubators were ajar.

Officer Pierce Hayden with the Memphis Police Department testified that he answered the call at Barrow-Agee. He observed a hole in the south wall of the building and set up a perimeter outside. While the perimeter was being set up, Officer Hayden saw a man wearing a black and white skull cap stick his head out of the hole. Officer Hayden ordered the man to come out of the hole and attempted to grab him, but the man retreated back inside the building.

Officer Hayden testified that he called for a K9 unit to come to the scene, and police maintained the perimeter while the K9 unit searched the building. No one was seen leaving the building while the K9 unit was searching. After the K9 unit emerged unsuccessfully, Officer Hayden and other officers went inside to search. Officer Hayden entered an attic area and began checking the beams and rafters, where he found the intruder in the northeast corner of the building. He ordered the man to come toward them, but the man lost his balance and fell through the ceiling. Officer Hayden followed the man through the hole in the ceiling and took him into custody. At trial, Officer Hayden identified the [Petitioner] as the man he saw trying to exit from the hole in the back of the building and ultimately arrested after the man fell through the hole in the ceiling.

Officer James Oliver with the Memphis Police Department testified that he responded to the scene with a K9 unit. Officer Oliver announced his presence and informed the intruder that he was going to release a dog into the building. When he got no reply, Officer Oliver entered the building with the K9 unit. The dog went to one specific room and indicated on an odor in the room by moving in a circle. The dog's movement indicated that he smelled something but could not determine its precise location. The dog then looked toward the ceiling. Officer Oliver announced his presence again and ordered the person to exit the ceiling, but he received no immediate response. After a minute, he heard someone moving in the ceiling. Officer Oliver exited the building and told the other officers where he heard a noise and an odor was detected by the K9 unit. Officer Oliver thereafter assisted in searching for the suspect, and he observed the suspect fall out of the ceiling from the attic. He identified the [Petitioner] as the man he saw fall from the ceiling.

Officer James Smith, a crime scene investigator with the Memphis Police Department, processed and photographed the scene. Officer Smith stated that a black and white skull cap, a pair of brown gloves, and a yellow flashlight were recovered from the ceiling inside the building.

Edgar Tenent, one of the owners of Barrow-Agee, testified that the laboratory was a freestanding building with thirty to forty rooms and was not open to the public. Tenent was called to the scene in regards to the break-in and, when he arrived, saw the police leading the [Petitioner] away from the building. He had never seen the [Petitioner] before, and the [Petitioner] did not have permission to enter the laboratory. Inside the laboratory, Tenent observed that many ceiling tiles were damaged and insulation had dropped down; wires were hanging through the ceiling in different parts of the building; and cabinet, refrigerator, and incubator doors were opened. He said it was "[j]ust a total mess in a large part of the building." It was determined that entry had been gained into the laboratory through an exhaust fan on the back of the building. Tenent explained that a safety cage covering the exhaust fan had been removed and the concrete around it had been knocked away, allowing entry. Tenent identified numerous photographs of the damage.

Brad Staples, an insurance adjust[e]r, inspected the building on January 14, 2011, the day after the break-in. He observed damage to multiple rooms in the building, stemming from someone crawling around in the heating and air conditioning system located above the acoustical drop tile ceiling. In addition, there was damage to the alarm system, the building had to be repainted, and the insulation had to be replaced. The total value of the damage was $23,654.74. Staples said that he negotiated for the lowest bids and, although it was possible someone could have done the work for less, no one could have done it for less than $10,000. He testified that the photographs of the damage exhibited to the jury were accurate representations of the damage he observed in the building.

Following the conclusion of the proof, the jury convicted the [Petitioner], as charged, of vandalism over $10,000 and burglary of a building.

*State v. Jeffrey Walton*, No. W2012-01609-CCA-MR3-CD, 2014 WL 465725, at *1-3 (Tenn. Crim. App. Jan. 31, 2014), *perm. app. denied* (Tenn. May 14, 2014). The trial court sentenced the Petitioner to an effective sentence of twenty-seven years. *Id.* at *1. On appeal, this court affirmed the Petitioner's convictions. *Id.* at *4-5.

*Post-Conviction Proceedings*

The Petitioner filed a pro se petition for post-conviction relief on June 12, 2014; after post-conviction counsel was appointed to represent the Petitioner, the petition was amended. At an evidentiary hearing, Edgar Tenent testified that he was an owner of Barrow-Agee Laboratories, which owned the property at 1555 Three Place. He explained that Laboratory Systems, Inc. owned one hundred percent of Barrow-Agee Laboratories. On cross-examination, Mr. Tenent stated that the names of the controlling company, Laboratory Systems, Inc., and its subsidiary, Barrow-Agee Laboratories, were occasionally used interchangeably.

First trial counsel[1] testified that she had been a practicing attorney for twenty-six years and had practiced criminal defense for almost twenty-five years. She stated that for thirteen years, she had worked as a head of the Felony Preliminary Hearing Team at the Shelby County Public Defender's Office, which handled over three thousand felony cases per year. At the Petitioner's preliminary hearing, the vandalism charge was bound over to the Shelby County Grand Jury, but the burglary charge was dismissed because the trial court determined that, based on the facts, the State "had not presented enough proof that there was an intent to commit a felony theft or assault therein." First trial counsel also noted that the Affidavit of Complaint listed an incorrect address; however, she did not believe that this error was the reason that the burglary charge was dismissed.

Second trial counsel testified that he had been an attorney for thirty-one years and that he had practiced criminal defense in the Shelby County Public Defender's Office for twenty-one years. He stated that he was currently assigned cases set in the Shelby County Criminal Court and that he worked on between sixty and seventy cases a year. However, during his representation of the Petitioner, he was assigned to the Shelby County Special Prosecution Unit, where he "had many more cases [and] many more trials." He recalled that the Petitioner's case was assigned to the Special Prosecution Unit because he "had at least five or six felonies, at the very least." Second trial counsel stated that the Petitioner made the decision to proceed to trial. He recalled that the State had offered a plea agreement with a four-year sentence with release eligibility after service of thirty percent of the sentence. Second and third trial counsel "begged and pleaded" for the Petitioner to accept the State's plea agreement because based on the facts, the Petitioner was most likely going to be convicted if he proceeded to trial. Second trial counsel could not recall whether the Petitioner insisted that he was innocent of the vandalism and burglary charges. He also did not recall discussing a trial strategy

---

[1] It appears from the record that three different attorneys represented the Petitioner. For purposes of clarity, we have designated the three attorneys as "first," "second," and "third" based on their chronological order of representation.

with the Petitioner, but he explained that he "spen[t] more time discussing with [the Petitioner] the fact that [the Petitioner] needed to take the offer, rather than having a trial strategy." He stated that, in his opinion, the Petitioner had "no trial strategy." He testified that he did not discuss possible affirmative defenses with the Petitioner.

Second trial counsel did not recall how often he met with the Petitioner or whether he specifically gave the Petitioner discovery from the State; however, he stated that it was his practice to give discovery to his clients. He did not recall how the Petitioner's indictment was phrased, and he did not research the victim named in the indictment. He also did not recall how many hours he spent preparing for the Petitioner's trial, and he did not investigate any potential witnesses. Second trial counsel stated that he was not aware of a federal civil suit against the victim in the Petitioner's case and that he did not investigate that issue. He stated that, if he had been aware that the victim had recently agreed to pay a settlement to resolve the civil suit, he would have attempted to introduce the settlement into evidence at the Petitioner's trial. He did not recall that the Petitioner was taken to the hospital after the offense, but he stated that he and third trial counsel "attempted to introduce some medical records[]" at trial. He explained that he "went to the Med personally and served subpoenas[.]" He stated that he never considered retaining an expert witness to testify at trial regarding the Petitioner's injuries. Although he attempted to introduce the Petitioner's medical records into evidence, second trial counsel stated that he did not see the records as "being a defense to either a burglary or vandalism charge[.]"

Second trial counsel recalled that several witnesses testified that they saw the Petitioner in the building that was vandalized and that witnesses heard the Petitioner "upstairs[.]" When asked if he introduced the Petitioner's medical records in support of a defense that the Petitioner lacked the physical ability to crawl into the rafters of the building, second trial counsel explained that the medical records were not helpful to the Petitioner's case and that "[t]he main reason [that he] was trying to enter those records [was] because [the Petitioner] wanted them entered[.]" Second trial counsel did not recall whether he introduced any proof at the Petitioner's sentencing hearing. He stated that he did not contact any of the Petitioner's family members about testifying for the Petitioner at the sentencing hearing because he "wasn't aware of any possible mitigation." He explained that the only issue at the sentencing hearing was whether the trial court would align the sentences concurrently or consecutively.

On cross-examination, second trial counsel recalled that, on the day of trial, the State made a second plea offer that was "just a ridiculously good offer." He explained that he "got frustrated" because the Petitioner declined the State's plea offer; therefore, second trial counsel asked third trial counsel to "talk with [the Petitioner] alone" to see if third trial counsel could convince the Petitioner to plead guilty. He agreed that it was his

practice to meet with his clients before trial and to determine the best approach for each case. Second trial counsel stated that the Petitioner understood the evidence against him and that he "tried to convey to [the Petitioner] as best [he] could what [he] thought the outcome would be." He explained that he conducted the voir dire during the Petitioner's trial, but third trial counsel handled the remainder of the trial under second trial counsel's supervision. Second trial counsel stated that he discussed trial strategy more with third trial counsel than he did with the Petitioner. He was not aware of anything he would have done differently than third trial counsel in the Petitioner's trial. He stated that even if he had presented evidence pertaining to the "peripheral issues," such as the Petitioner's medical records or the correct name of the victim business, the evidence would not have affected the jury's verdict.

On redirect examination, second trial counsel explained that "peripheral issues" were issues that did not directly defend the charges against the Petitioner. He stated that even if there was evidence that the Petitioner did not have the ability to crawl into the attic of the building, it was "indefensible" that the Petitioner fell through the attic. In second trial counsel's opinion, all the "peripheral issues" in the aggregate would not have affected the Petitioner's case. Second trial counsel stated that he "failed [the Petitioner] because [he] didn't get [the Petitioner] to plead to that four years." On recross-examination, second trial counsel stated that the Petitioner never informed him that it was another individual that fell out of the attic of Barrow-Agee Laboratories.

Third trial counsel testified that, prior to the Petitioner's trial, he had worked on trials as second chair, but the Petitioner's trial was his first trial as first chair. Before third trial counsel began representing the Petitioner, second trial counsel had already obtained the preliminary hearing transcripts, medical records, and the discovery packet. Third trial counsel specifically remembered that, while the Petitioner's case was in general sessions court, the State offered a sentence of three years, and the Petitioner rejected this offer. After the Petitioner's case was bound over to the Shelby County Grand Jury, the State offered the Petitioner a sentence of six years. However, third trial counsel explained that the State later offered the Petitioner a four-year sentence, "which was still good, even up until the morning of trial." Third trial counsel recalled that second trial counsel became "frustrated" when the Petitioner continued to decline the State's plea offer, so third trial counsel informed the Petitioner that he did not "see a strong defense argument that [he] would have felt comfortable presenting to the jury[.]" He also informed the Petitioner that it was the Petitioner's decision to plead guilty or proceed to trial. Third trial counsel stated that "based on how much time [the Petitioner] had already served, he would have been essentially parole-eligible on a four[-]year at thirty percent . . . offer," so third trial counsel advised the Petitioner that it was in his best interest to take the offer.

Third trial counsel recalled that he discussed the possible range of punishment for the vandalism and burglary charges with the Petitioner; he stated that the Petitioner had ten or eleven prior felonies and that the Petitioner would be sentenced as a career offender on the Class D burglary charge and as a Range III offender on the Class C vandalism charge. Third trial counsel informed the Petitioner that the trial court could order his sentences for the vandalism and burglary charges to run consecutively to each other. Third trial counsel explained that he "did all the arguing" at the Petitioner's trial, but he deferred to second trial counsel for strategic decisions, such as objections and voir dire.

On cross-examination, third trial counsel stated that he met with the Petitioner "multiple times" before trial. When third trial counsel advised the Petitioner regarding the State's plea offer, the Petitioner "took some time to think about it[,]" but the Petitioner asserted that he was innocent of the charges and that he wanted to proceed to trial. He recalled that the Petitioner declined the State's plea offers because the Petitioner was on probation or parole when he committed the instant offense, and the Petitioner knew that any sentence he received for the current offense could be served consecutively to the sentence for which he was on probation or parole. He explained that the Petitioner's version of the offense "changed a couple of times[]"; the Petitioner initially informed third trial counsel that he had been staying in a hotel room but the water had been shut off so "he went out looking for shelter or a place to stay." Based on this information, third trial counsel "explored possibly making a necessity argument," but third trial counsel was unable to corroborate the Petitioner's story. Next, the Petitioner informed third trial counsel that "the police had essentially beat [the Petitioner] up on the sidewalk as he was walking around. And they dragged him inside this business that had been burglarized and tried to frame him for the burglary[.]" Third trial counsel informed the Petitioner that the State would call independent, non-police witnesses to testify about the Petitioner's involvement in the vandalism and burglary. Third trial counsel stated that he and second trial counsel "started out preparing to argue that it was a frame job because [the Petitioner] was considering taking the stand and testifying to that effect." However, the Petitioner chose not to testify after the *Momon* hearing, so third trial counsel "had no basis for making that argument" and "instead[] tried to argue insufficiency of the evidence and a lack of intent." Third trial counsel advised the Petitioner about the decision of whether to testify and informed the Petitioner that the trial court would likely admit evidence of his previous convictions for impeachment purposes.

Third trial counsel stated that he prepared cross-examination questions for each of the State's witnesses, and he believed that there was no other way that he could have better prepared. Third trial counsel agreed that the indictment listed "Barrow-Agee, Inc." as the victim. He recalled that he conducted an Internet search on the business's name and noted that it appeared to be "a legitimate business at the address in question . . . ."

He explained that he "had no reason to believe that it was not a corporate entity, a functioning business, and [based on] all the paperwork [that he had] seen since, [he] still believe[d] [that] it was a legitimate corporate entity that had ownership over the property." Third trial counsel stated that there was no testimony at trial regarding the name or location of Barrow-Agee Laboratories that he was not aware of prior to trial, but if there had been, he would have explored the issue at trial.

Third trial counsel stated that, since the Petitioner's trial, he had served as first chair on over a dozen jury trials, and he "almost never argue[d] in the alternative" because he believed that presenting multiple theories or defenses to the jury was not persuasive and that it reduces the credibility of defense counsel. Third trial counsel noted that, while he could have presented other arguments to the jury in the Petitioner's case, he did not believe that different arguments would have affected the jury's verdict. On redirect examination, third trial counsel agreed that the Petitioner "express[ed] his dissatisfaction with his representation during trial." He stated that he met with the Petitioner several times during the week before trial, and that during trial, he spoke with the Petitioner at every opportunity and asked the Petitioner if "there [was] anything [the Petitioner] wanted [him] to say, ask, [or] do." He explained that the strategy at the Petitioner's trial "was to argue that someone else caused the damage[]"; therefore, he stated that questioning Mr. Tenent about the financial condition of the business at the time of the offense would not have been helpful because "that would be a strategy based around arguing that the business was lying for some reason." Third trial counsel testified that the indictment gave the Petitioner adequate notice of the charges against him.

Bobbie Holmes testified that she is the Petitioner's sister and that the Petitioner had never been homeless. She stated that the Shelby County Public Defender's Office never contacted her regarding the Petitioner's sentencing hearing. She explained that, if the Shelby County Public Defender's Office had contacted her, she would have testified for the Petitioner. She also stated that other family members would have testified in support of the Petitioner. On cross-examination, Ms. Holmes agreed that she was not an eyewitness to the offense.

The Petitioner testified that on the offense date he left his hotel room because the water was not running in his room. He noted that he had his probation officer's permission to stay at the hotel. The Petitioner walked to a near-by gas station to purchase some water and observed Officer Hayden sitting in a vehicle and speaking to an individual standing in the gas station doorway. The Petitioner asked Officer Hayden where he could purchase some water, and Officer Hayden informed him that the area was under an inclement weather advisory and that the Petitioner should return to his hotel room. The Petitioner began walking back to his room, but instead, he returned to the gas station. The gas station was closed, but the Petitioner noticed "blue lights behind the

store." As the Petitioner walked behind the gas station, he noticed that a police car was driving behind him. He observed "a lot of officers outside in a group somewhere." The Petitioner stated that he attempted to greet the officers, but no one would respond to him. He testified that the officers circled him and attacked him. He stated that one officer hit him in the head with a flashlight and that the next thing that he remembered was that a fire truck and an ambulance arrived. The Petitioner explained that he asked first and second trial counsel to subpoena the video recording from any nearby cameras to corroborate this attack.

The Petitioner stated that second trial counsel was "extremely abusive, verbally abusive" from the beginning of the representation. He explained that second trial counsel was so abusive that he mentioned it to the trial court. However, the trial court informed him that second trial counsel was a good attorney and set the Petitioner's case for trial. He stated that he filed a complaint against second trial counsel with the Tennessee Board of Professional Responsibility after his trial. He informed second trial counsel that he did not burglarize the building, but second trial counsel wanted the Petitioner to accept the State's plea offer. The Petitioner stated that the State's first plea offer included a sentence of eight years with release eligibility after service of sixty percent of the sentence. He stated that he was never informed that the State offered any other plea agreements until the State offered a three-year sentence before trial. However, the Petitioner stated that he "wouldn't have t[aken] thirty minutes because [he] didn't burglarize the place." The Petitioner stated that he had been handicapped since 2003 when he was injured in a car wreck; his right foot was crushed and his back was broken. He explained that his injuries prohibited him from lifting heavy objects or climbing. The Petitioner testified that "practically everything that [third trial counsel] said was a lie." He stated that he met with third trial counsel "one time for approximately ten minutes, three days before [his] trial[]" and that third trial counsel never discussed the State's final plea offer with him.

On cross-examination, the Petitioner testified that, after the State rested its case at trial, second trial counsel informed him that there was no need for him to testify because second trial counsel believed that the Petitioner had not committed burglary. He agreed that during the *Momon* hearing the trial court discussed with him the decision to testify and informed the Petitioner that, if he testified, the State could ask the Petitioner about his prior felony convictions. He agreed that the trial court asked him whether anyone had forced or coerced him to testify or not testify and that he said it was his decision to not testify. However, the Petitioner stated that he wanted to testify at trial, but he believed at the time that his prior convictions "would be held against [him]." He agreed that he had previously broken into other businesses, but he stated that he "never targeted a place intentionally." The Petitioner agreed that most of his prior convictions were for burglary or theft. He agreed that he was on probation at the time of the current offense.

When the post-conviction court asked the Petitioner what he believed first and second trial counsel should have done for his case, the Petitioner stated that they should have investigated the case and called the ambulance drivers to testify at trial. He also stated that first and second trial counsel should have spoken with his family and that they should have objected when the State mentioned in its opening statement that the Petitioner was "homeless and hungry." The Petitioner asserted that he never made a statement to the police after the offense. He also stated that second and third trial counsel should have requested medical records regarding the ambulance and fire truck that arrived at the scene after the police assaulted him, which would have shown that the Petitioner never entered the building, and they should have subpoenaed his parole and probation officers to show that he had successfully completed alternative sentencing.

The post-conviction court found that the Petitioner decided to proceed to trial and found that the Petitioner's testimony at the post-conviction hearing was inconsistent with "everything that every witness testified to that took that stand during the course of th[e] trial." The post-conviction court noted that all the witnesses at trial testified that the name of the company that owned the building was "Barrow-Agee" and found that "whether or not the business is incorporated under a different name, the business in Shelby County, Tennessee, is, in fact, Barrow-Agee." The post-conviction court found that third trial counsel researched the victim named in the indictment, and "the name and the address did correspond with the business that was located." The post-conviction court found:

> [t]here has not been anything presented in [c]ourt today that would allow the [post-conviction c]ourt to guess, speculate as to what other investigation could have been done, what other discovery could have been done, what other witnesses should have been interviewed that should have been presented at trial that were not presented at th[e] [post-conviction] hearing.

The post-conviction court concluded that the Petitioner "failed to demonstrate how he was prejudiced because he . . . presented no witnesses [at the post-conviction hearing] other than a sister, who says that he [has] never [been] homeless." The post-conviction court found that, while the Petitioner asserted that second and third trial counsel should have obtained the Petitioner's additional medical records, the Petitioner did not present the records as evidence at the post-conviction hearing. The post-conviction court declined to "speculate as to what value [the medical records] may have had." Regarding the Petitioner's assertion that second and third trial counsel should have subpoenaed his records from the parole board, the post-conviction court found that the records were not relevant to the charges against the Petitioner.

- 11 -

The post-conviction court also found that the indictment "put [the Petitioner] on notice as to exactly what conduct the State of Tennessee had accused him of. He was provided with discovery that identified the place of business as being Barrow-Agee, Inc[.], [that] g[ave] an address, [and] g[ave] a location in Shelby County, Tennessee." The post-conviction court found that Mr. Tenent testified that the name of the business was Barrow-Agee and that "[a]ll the witnesses that testified indicated that they worked for Barrow-Agee." The post-conviction court also found that "[t]here [wa]s absolutely nothing that would indicate that counsel erred by not asking for any other jury charges that could have or should have been asked for[]" and that "[t]here [was] no indication that necessity or duress or any other requested charges should have been made in this case." The post-conviction court noted that the Petitioner testified at the post-conviction hearing that "he was not suffering from duress, and that he, in fact, was in a hotel and did not, in fact, enter that building and did not commit a crime." The post-conviction court concluded that second and third trial counsel's decision against requesting jury instructions on duress or necessity was not deficient. The post-conviction court concluded that "[t]here [was] absolutely nothing that . . . indicate[d] that [second trial counsel] and [third trial counsel] were ineffective in representing [the Petitioner]." The post-conviction court did not credit the testimony of the Petitioner and concluded that second and third trial counsel "more than adequately represented [the Petitioner]." The post-conviction court denied the Petitioner's request for relief.

## II. Analysis

The Petitioner argues that second and third trial counsel's performance was deficient because they: (1) failed to prepare a trial strategy; (2) failed to properly investigate the case; (3) failed to effectively cross-examine witnesses; and (4) failed to request jury instructions on the defenses of necessity and duress. The Petitioner asserts that he was prejudiced because absent these deficiencies, he would have likely been convicted of a lesser-included offense or acquitted of the offenses.

*Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally,

"questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley,* 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### *Failure to prepare a trial strategy*

The Petitioner contends that second and third trial counsel failed to prepare a trial strategy. The Petitioner points out that second trial counsel stated at the post-conviction hearing that he spent more time discussing the State's plea offers with the Petitioner than preparing a trial strategy and that second trial counsel stated that "there was no trial strategy." The Petitioner argues that second trial counsel was "overburdened" and "just let the trial happen without a plan."

At the post-conviction hearing, second trial counsel had the following exchange with the Petitioner's counsel:

> [PETITIONER'S COUNSEL]: Do you remember ever discussing a trial strategy with [the Petitioner]?
>
> [SECOND TRIAL COUNSEL]: No, I don't. That's not to say I didn't. I just can't remember specifically because we're looking back, I'm having -- it's been a few years, and as far as what a strategy would have been, I was more concerned about -- because the offer was open until even the day of trial.
>
> I'll be honest with you. I was spending more time discussing with him the fact that he needed to take the offer, rather than having a trial strategy. It's just there -- in all honesty, there was no trial strategy. There still isn't, in my opinion.

However, second trial counsel also stated that he discussed trial strategy with third trial counsel. Third trial counsel testified that, after learning of the Petitioner's version of the events, he considered pursuing a necessity or duress argument, but he was unable to corroborate the Petitioner's version of the events. He explained that the strategy at the Petitioner's trial "was to argue that someone else caused the damage." The post-conviction court implicitly credited the testimony of second and third trial counsel at the post-conviction hearing.

We conclude that the Petitioner has failed to establish that second and third trial counsel's performance was deficient for lack of a trial strategy. While second trial counsel stated at the post-conviction hearing that "there was no trial strategy[,]" third trial

counsel testified about the efforts he made to craft a trial strategy for the Petitioner, first based on a necessity or duress defense, and later on an argument that "someone else caused the damage." Because the Petitioner has failed to establish that second and third trial counsel's representation in this aspect was deficient, we will not address whether the Petitioner was prejudiced by their performance. *See Finch*, 226 S.W.3d at 316. The Petitioner is not entitled to relief on this ground.

### *Failure to investigate the case*

The Petitioner contends that second and third trial counsel failed to properly investigate his case. More specifically, the Petitioner contends that second and third trial counsel failed to discover that "the name[d] victim in the indictment did not exist at the time of the incident." The Petitioner asserts that "Barrow-Agee, Inc. did not own the building at 1555 Three Place[]" and that "Barrow-Agee[,] Inc. is a nonexistent entity that merged with another company called Geo Construction Testing of Tennessee, Inc. in 1982." The Petitioner argues he was prejudiced by this deficient performance because the indictment listed "Barrow-Agee, Inc." as the victim; he asserts that this created a fatal variance in the indictment, leaving him unprotected from double jeopardy. The Petitioner additionally argues that second and third trial counsel failed to investigate the background of Barrow-Agee Laboratories, specifically the federal employment lawsuit that Barrow-Agee Laboratories was defending against at the time of the offense. He argues that he was prejudiced by this deficiency because if this evidence had been discovered he could have argued at trial that the company inflated the value of the damages because of the company's poor financial condition.

Both the United States and Tennessee Constitutions require that a charging instrument inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also State v. Hammonds*, 30 S.W.3d 294, 297 (Tenn. 2000). Our supreme court has held that the charging instrument must "contain a complete description of such facts and circumstances as will constitute the crime." *Tipton v. State*, 28 S.W.2d 635, 636 (Tenn. 1930). Generally, "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).

Additionally, the form of indictments is prescribed by Tennessee Code Annotated section 40-13-202, which states in part:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to

enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

Tenn. Code Ann. § 40-13-202.

At common law, indictments were subject to strict pleading requirements because the elements of the offenses were not easily ascertained by reference to a statute. *Hill*, 954 S.W.2d at 728. However, today courts approach challenges to charging documents "'from the broad and enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding.'" *Id.* (quoting *United States v. Purvis*, 580 F.2d 853, 857 (5th Cir. 1978)). Generally, charging documents must allege the material elements of the offense, and the "touchstone for constitutionality is adequate notice to the accused." *Id.* at 729. Specific reference to the statute defining the offense may be sufficient to place a defendant on notice of the offense with which he is charged. *Ruff v. State*, 978 S.W.2d 95, 97 (Tenn. 1998). A variance between the indictment and the proof submitted at trial is fatal when it is "deemed to be material and prejudicial." *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). "A variance between an indictment and the proof in a criminal case is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Id.* (internal citations omitted).

Tennessee Code Annotated section 39-14-401, which applies to the vandalism and burglary statutes, defines "owner" as "a person in lawful possession of property whether the possession is actual or constructive." Tenn. Code Ann. § 39-14-401(3). A person, as defined by the Tennessee Code Annotated, includes "the singular and the plural and means and includes any individual, firm, partnership, co[-]partnership, association, corporation, governmental subdivision or agency, or other organization or other legal entity, or any agent or servant thereof[.]" Tenn. Code Ann. § 39-11-106(27).

In *State v. March*, this court examined a variance in an indictment that the defendant alleged was fatal; the indictment "allege[d] that the defendant stole 'the property of [the law firm], without the effective consent of [the law firm][,]'" but the defendant "argue[d] that the evidence showed that the owners of the [stolen client fee payments] were Greenberg and Eichel, the clients." *State v. March*, 293 S.W.3d 576, 591 (Tenn. Crim. App. 2008). This court noted that "one could view the charging language as alleging the ownership element by referring to an owner who did not consent to the taking of the property and that the specification of [the law firm] as that owner was mere surplusage." *Id.* at 591. This court determined that the defendant failed to establish that

- 16 -

the variance was material because the law firm could have also been considered an owner of the stolen property at the time of the offense because the law firm's contractual claim against the clients for unpaid fees "may have survived their payments to the defendant." *Id.* at 592. This court concluded that "the terms of the indictment and the evidence at trial substantially correspond[ed], and based upon the record, [the court] f[ou]nd no indication that the defendant was hampered in the preparation and presentation of his defense." *Id.* at 593. The court additionally noted that, even if the variance in the indictment had been material, the defendant was protected from double jeopardy because "th[e] record on appeal, including this opinion, bears witness to the identity of the bases of a theft offense[.]" *Id.* (citing *State v. Gordon Scott Katz*, No. E1999-01220-CCA-R3-CD, 2000 WL 1460227, at *5 (Tenn. Crim. App., Oct. 2, 2000)).

In this case, the Petitioner's indictment for count 1 alleged that the Petitioner "did unlawfully and knowingly cause damage in the amount of $10,000 or more but less than $60,000 to the real or personal property, to wit: a wall, ceiling tiles, venting system and computers, of BARROW AGEE INC. without their effective consent . . . ." The indictment for count 2 alleged that the Petitioner "did unlawfully and knowingly enter a building other than a habitation of BARROW AGEE INC., not open to the public, without the effective consent of the said BARROW AGEE INC., with intent to commit theft . . . ." At the post-conviction hearing, Mr. Tenent testified that he was an owner of Barrow-Agee Laboratories located at 1555 Three Place and that Laboratory Systems, Inc. owned 100% of Barrow-Agee Laboratories. Mr. Tenent also testified that the names Barrow-Agee Laboratories and Laboratory Systems, Inc. are occasionally used interchangeably. Third trial counsel conducted an Internet search on Barrow-Agee and noted that it appeared to be "a legitimate business at the address in question . . . ." He explained that he "had no reason to believe that it was not a corporate entity, a functioning business, and all the paperwork [that he had] seen since, [he] still believe[d] [that] it was a legitimate corporate entity that had ownership over the property." He also stated that there was no testimony or evidence presented at trial regarding the name or location of the burglarized and vandalized building that surprised him. At the post-conviction hearing, the post-conviction court admitted into evidence records from the Shelby County Register of Deeds Office.[2] These records show that on December 26, 2001, Barrow-Agee Laboratories, Inc. executed a deed of trust for the property at 1555 Three Place. On December 21, 2006, Barrow-Agee Laboratories, Inc.'s name was amended in its charter to Laboratory Systems, Inc. On August 23, 2011, Barrow-Agee Laboratories, Inc. filed an amended financing statement to continue First Tennessee

---

[2] The post-conviction court admitted the documents "for the purposes of review by the Court of Criminal Appeals . . ." and found that the documents were not relevant to the issue of whether the Petitioner received ineffective assistance of counsel from second and third trial counsel.

Bank's security interest in real property.[3]  Additionally, the Petitioner attached to his petition records from the Tennessee Secretary of State's Office; the filing information for Barrow-Agee Laboratories, LLC, lists its principal address as 1555 Three Place.  The certificate of existence for Laboratory Systems, Inc. does not list an address.

The post-conviction court noted that all the witnesses at trial testified that the name of the company that owned the building was "Barrow-Agee" and found that "whether or not the business is incorporated under a different name, the business in Shelby County, Tennessee, is, in fact, Barrow-Agee."  The post-conviction court found that third trial counsel researched the victim named in the indictment, and "the name and the address did correspond with the business that was located."  The post-conviction court also found that the indictment put the Petitioner on notice of the charges against him and noted that the Petitioner "was provided with discovery that identified the place of business as being Barrow-Agee, Inc[.], [that] g[ave] an address, [and] g[ave] a location in Shelby County, Tennessee."

The evidence in the record does not preponderate against the post-conviction court's findings.  Much like this court concluded in *State v. March*, we conclude that both Barrow-Agee Laboratories and Laboratory Systems, Inc. could be considered owners of the building that the Petitioner burglarized and vandalized.  As the Petitioner noted in his brief, ownership is not a material element of either the vandalism or burglary offenses. Thus, the addition of "Barrow Agee Inc." to the language of the indictment could be considered surplusage.  *See March*, 293 S.W.3d at 591.  Additionally, the indictment listed the statute of the offenses for which the Petitioner was indicted, giving the Petitioner sufficient notice of the charges against him.  *See Ruff*, 978 S.W.2d at 97.  The evidence introduced at trial did not substantially vary from the information on the indictment, and there is no evidence that the Defendant's efforts at defending against these charges were hampered by the notice given by the indictment.  Further, if second or third trial counsel had successfully challenged the indictment, the State would have likely obtained a superseding indictment that included the address of the property or also listed Laboratory Systems, Inc.  The Petitioner has not established that he was prejudiced by second and third trial counsel's failure to investigate Barrow-Agee Laboratories and to challenge the indictment.

Regarding the Petitioner's allegation that second and third trial counsel should have investigated the financial background of Barrow-Agee Laboratories, we conclude that even if the indictment had listed both Barrow-Agee Laboratories and Laboratory

---

[3] The amended financing statement does not specify an address for the real property serving as collateral, but the statement lists the same property legal description as the description used in the 2002 deed of trust executed by Barrow-Agee Laboratories, Inc. for 1555 Three Place.

Systems, Inc., the trial court would have likely found that any evidence of a civil suit brought against Barrow-Agee Laboratories and Laboratory Systems, Inc. was not relevant to the Petitioner's case. Thus, the Petitioner would have been precluded from using this information to argue that the companies inflated the value of damage to the building because the companies were in poor financial condition, and he cannot establish that he was prejudiced by second and third trial counsel's failure to investigate the financial background of Barrow-Agee Laboratories.

Because we have determined that the Petitioner was not prejudiced by second and third trial counsel's alleged failure to investigate Barrow-Agee Laboratories, we will not address whether their performance was deficient. *See Finch*, 226 S.W.3d at 316. The Petitioner is not entitled to relief on this ground.

### *Failure to properly cross-examine witnesses*

The Petitioner asserts that second and third trial counsel failed to properly cross-examine Mr. Staples regarding the estimated losses that the building sustained. More specifically, the Petitioner notes that the damages included the cost of repainting the building and repairing the insulation, which "had nothing to do with [the Petitioner]." He asserts he was prejudiced by this deficiency because with this knowledge, second and third trial counsel "could have argued that the value of the damage done to the walls could [have] be[en] subtracted from the personal property that was owned by Barrow[-]Agee."

The Petitioner additionally asserts that if second and third trial counsel had properly cross-examined Mr. Tenent, they would have discovered that Mr. Tenent "owns Barrow-Agee Laboratories, through the shell corporation Laboratory Systems, Inc[.] and acts as the company's Chief Financial Officer[]" and that "around or about the time of the break-in, [Barrow-Agee Laboratories] was being sued in federal court[.]" He argues that he was prejudiced by this deficiency because second and third trial counsel could have "established the personal bias and interest of [Mr.] Tenent in Barrow[-]Agee [Laboratories] and Laboratory Systems, Inc[.], brought to the jury's attention the financial pressures [that] the business was facing, and provided the jury with a reason to not believe that the damages were as high as twenty thousand dollars ($20,000)."

At trial, Mr. Staples testified that the cost of repairing the building was $23,654.74; this included damage to "multiple rooms in the building, stemming from someone crawling around in the heating and air conditioning system located above the acoustical drop tile ceiling. In addition, there was damage to the alarm system, the building had to be repainted, and the insulation had to be replaced." *Jeffrey Walton*, 2014 WL 465725, at *3. The post-conviction court noted that all the witnesses at trial testified

that the name of the company that owned the building was "Barrow-Agee" and found that "whether or not the business is incorporated under a different name, the business in Shelby County, Tennessee, is, in fact, Barrow-Agee." As noted above, the filing information for Barrow-Agee Laboratories, LLC, lists its principal address as 1555 Three Place. At the post-conviction hearing, the Petitioner failed to establish how much of the cost of repairs could be attributed to the ownership interests of Laboratory Systems, Inc. versus the ownership interests of Barrow-Agee Laboratories, besides arguing that he was not responsible for the cost incurred for repainting the building and replacing insulation. Because the Petitioner has failed to prove how much of the damage could be attributed to the ownership of Barrow-Agee Laboratories, he has failed to establish that he was prejudiced by second and third trial counsel's cross-examination of Mr. Staples.

At the post-conviction hearing, Mr. Tenent testified that he was an owner of Barrow-Agee Laboratories, which owned the property at 1555 Three Place, and that Laboratory Systems, Inc. owned one hundred percent of Barrow-Agee Laboratories. The post-conviction court admitted evidence of a civil suit that a former employee filed against Barrow-Agee Laboratories and the resulting settlement. However, the post-conviction court noted that if second or third trial counsel had attempted to admit the evidence of the civil suit at the Petitioner's trial, the trial court would not have admitted the evidence because it was not relevant to the current offenses. Noting that the cost of damages was evaluated by an independent insurance adjuster, Mr. Staples, the post-conviction court found that:

> [i]t [wa]s not relevant to any issues at all to allow a jury to speculate that perhaps, because [Mr. Tenent's] business ha[d] been sued, that Mr. Staples, who has nothing to do with Barrow-Agee, may have given you a figure of twenty-three thousand, six hundred fifty-four dollars and seventy-four cents ($23,654.74), and somehow that is influenced by the fact that this business has been sued before.

We agree with the post-conviction court that any evidence of a civil suit filed against Barrow-Agee Laboratories would not have been admitted into evidence at the Petitioner's trial. Therefore, the Petitioner cannot prove that he was prejudiced by second and third trial counsel's failure to cross-examine Mr. Tenent regarding the civil suit or his role in the management of Barrow-Agee Laboratories or Laboratory Systems, Inc. Because the Petitioner has failed to establish that he was prejudiced by second and third trial counsel's performance in this aspect, we will not address whether their performance was deficient. *See Finch*, 226 S.W.3d at 316. He is not entitled to relief on this ground.

## *Failure to request jury instructions*

Lastly, the Petitioner argues that second and third trial counsel failed to request jury instructions on the affirmative defenses of duress and necessity. The Petitioner asserts that "[i]f trial counsel had asserted the affirmative defenses of [d]uress and [n]ecessity, the jury would have had two reasons to find [the Petitioner] not guilty."

In Tennessee, a defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000) (citing *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Additionally, trial courts have a duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). "The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c).

Tennessee Code Annotated section 39-11-504 defines the defense of duress as the following:

> . . . a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

Tenn. Code Ann. § 39-11-504(a). Tennessee Code Annotated section 39-11-609 defines the defense of necessity as the following:

> Except as provided in §§ 39-11-611--39-11-616, 39-11-620 and 39-11-621, conduct is justified, if:
>
> (1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
>
> (2) The desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

Tenn. Code Ann. § 39-11-609.

At the post-conviction hearing, third trial counsel testified that the Petitioner's version of the offense "changed a couple of times[]"; the Petitioner initially informed third trial counsel that he had been staying in a hotel room but the water had been shut off so "he went out looking for shelter or a place to stay." Based on this information, third trial counsel "explored possibly making a necessity argument," but third trial counsel was unable to corroborate the Petitioner's story. Next, the Petitioner informed third trial counsel he had been assaulted by police officers and was being framed for the burglary and vandalism of the building. Ms. Holmes testified that the Petitioner had never been homeless. The Petitioner testified that he was living in a hotel at the time of the offenses. However, the post-conviction court did not credit the Petitioner's testimony.

The post-conviction court found that "[t]here [wa]s absolutely nothing that would indicate that counsel erred by not asking for any other jury charges that could have or should have been asked for[]" and that "[t]here [was] no indication that necessity or duress or any other requested charges should have been made in this case." The post-conviction court noted that the Petitioner testified at the post-conviction hearing that "he was not suffering from duress, and that he, in fact, was in a hotel and did not, in fact, enter that building and did not commit a crime." The post-conviction court concluded that second and third trial counsel "did not ineffectively represent the [Petitioner] because they chose not to ask for a jury instruction on 'duress' or 'necessity.'"

We agree with the post-conviction court's conclusion that the Petitioner failed to establish that second and third trial counsel's performance was deficient for failing to request jury instructions on duress or necessity. Third trial counsel researched the possibility of arguing the defenses of necessity or duress at trial, but he was unable to corroborate the Petitioner's story. Further, the Petitioner abandoned this theory of the case when he informed third trial counsel that he had never entered the building and by testifying at the post-conviction hearing that he was living in a hotel at the time of the offense. The defenses of duress and necessity were not fairly raised by the proof at trial, and therefore, second and third trial counsel's performance was not deficient by failing to request jury instructions on these defenses. The Petitioner is not entitled to relief on this ground.

## III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 22 -